IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FULTON BANK, N.A.,

Plaintiff/ Counter Defendant

v. Case No. 1:26-cv-02325-PTG-LRV

VISION PROPERTY HOLDINGS LLC, et al

Defendants / Counter Plaintiffs

**COUNTERCLAIMS OF DEFENDANTS VISION PROPERTY HOLDINGS LLC, VISION MOTORS, INC., VISION SERVICE CENTER, INC., GREEN LIGHT CONSULTING CORP., JASON J. BROWN, AND NUVIA H. GOMEZ, AND DEMAND FOR JURY TRIAL**

Defendants and Counterclaim Plaintiffs Vision Property Holdings, LLC; Vision Motors, Inc.; Vision Service Center, Inc.; and Green Light Consulting Corp. (collectively, "Vision" or the "Borrowers"); Jason J. Brown ("Brown"); and Nuvia H. Gomez ("Gomez") (Vision, Brown, and Gomez are collectively referred to herein as "Counterclaim Plaintiffs"), by counsel, for their Counterclaims against Plaintiff and Counterclaim Defendant Fulton Bank, N.A. ("Fulton" or the "Bank"), under Fed. R. Civ. P. 13, state as follows:

**Jurisdiction and Venue**

1. These Counterclaims arise out of the same Loan, Note, Guarantees, Security Agreement, Deeds of Trust, and course of dealing between the parties that are the subject of Fulton's Complaint, and are compulsory counterclaims under Fed. R. Civ. P. 13(a). This Court accordingly has subject-matter jurisdiction over these Counterclaims under 28 U.S.C. § 1367(a), as they form part of the same case or controversy under Article III as Fulton's claims.

2. This Court independently has subject-matter jurisdiction over these Counterclaims under 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between Counterclaim Plaintiffs, all of whom are citizens of the Commonwealth of Virginia, and Counterclaim Defendant Fulton Bank, N.A., a citizen of Pennsylvania, and the matter in controversy, exclusive of interest and costs, exceeds $75,000.

3. Venue is proper in this District under 28 U.S.C. § 1391(b) for the same reasons venue is proper as to Fulton's claims, and because Fulton chose to bring this action in this District.

4. Virginia substantive law governs each of the Counterclaims set forth below.

**Parties**

5. Counterclaim Plaintiff Vision Property Holdings, LLC is a Virginia limited liability company with a principal place of business at 9145 Centreville Road, Manassas, Virginia 20110. Its sole member, Jason J. Brown, is a citizen of and domiciled in Virginia; accordingly, Vision Property Holdings, LLC is a citizen of Virginia for purposes of diversity jurisdiction.

6. Counterclaim Plaintiff Vision Motors, Inc. is a stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business at 9145 Centreville Road, Manassas, Virginia 20110, and is therefore a citizen of Virginia.

7. Counterclaim Plaintiff Vision Service Center, Inc. is a stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business at 9145 Centreville Road, Manassas, Virginia 20110, and is therefore a citizen of Virginia.

8. Counterclaim Plaintiff Green Light Consulting Corp. is a stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business at 17139 Belle Isle Drive, Dumfries, Virginia 22026, and is therefore a citizen of Virginia.

9. Counterclaim Plaintiff Jason J. Brown is an adult individual who is a citizen of and domiciled in Virginia.

10. Counterclaim Plaintiff Nuvia H. Gomez is an adult individual who is a citizen of and domiciled in Virginia.

11. Plaintiff and Counterclaim Defendant Fulton Bank, N.A. is a national banking association with its main office, as designated in its articles of association, in Lancaster, Pennsylvania, and is therefore a citizen of Pennsylvania for diversity purposes.

**The Loan Documents**

12. On or about July 13, 2023, Vision entered into a Loan Agreement with Fulton for a commercial loan, guaranteed in part by the U.S. Small Business Administration ("SBA"), SBA Loan No. 4819479103 (the "Loan") in the original principal amount of $4,340,000, later reduced to $4,215,000 by an Allonge to SBA Note dated February 25, 2024 (the "Allonge"). The Note and the Allonge are already before this Court as Exhibits 1 and 7, respectively, to Fulton's Complaint (ECF Nos. 1-1, 1-7), and are not re-attached here.

13. At the same time and place, Brown personally guaranteed Vision's performance under the Loan (the "Brown Guaranty"). The Brown Guaranty is already before this Court as Exhibit 5 to Fulton's Complaint (ECF No. 1-5), and is not re-attached here.

14. At the same time and place, Gomez guaranteed Vision's performance under the Loan pursuant to a limited guaranty (the "Gomez Guaranty"). The Gomez Guaranty is already before this Court as Exhibit 6 to Fulton's Complaint (ECF No. 1-6), and is not re-attached here.

15. The Loan is secured by a Security Agreement dated July 13, 2023, as well as a related UCC-1 Financing Statement. The Security Agreement is already before this Court as Exhibit 4 to Fulton's Complaint (ECF No. 1-4), and is not re-attached here. A copy of the UCC-1 Financing Statement, which is not among Fulton's exhibits, is attached hereto as Exhibit A.

16. The Loan is further secured by Deeds of Trust to real properties known as 17139 Belle Isle Drive, Dumfries, Virginia 22026 (the "Belle Isle Property") and 9145 Centreville Road, Manassas, Virginia 20110 (the "Centreville Property"). The Belle Isle Property Deed of Trust and the Centreville Property Deed of Trust are already before this Court as Exhibits 3 and 2, respectively, to Fulton's Complaint (ECF Nos. 1-3, 1-2), and are not re-attached here.

17. At all relevant times, Fulton has serviced the Loan as an SBA lender subject to the SBA's Standard Operating Procedures ("SOPs"), including SOP 50 57.

18. Sections 5 and 6 of the Note give Fulton, as Lender, broad unilateral authority to act with respect to the Loan and the Collateral without notice to, or the consent of, Borrower—including the authority to release any party obligated to pay the Note, and to compromise, release, renew, extend, or substitute any of the Collateral. Nothing in Sections 5, 6, or elsewhere in the Note conditions the exercise of that authority on any approval by the SBA.

19. Section 7 of the Note, titled "When Federal Law Applies," provides that "When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations." Fulton, not the SBA, has at all relevant times been the owner and holder of the

Note, including as alleged by Fulton itself in its Complaint. Section 7's SBA-approval framework therefore does not apply to Fulton's own dealings with the Borrowers.

20. Section 9(E) of the Note provides only that "Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note." The Reinstatement Agreement described below was memorialized in a written email, not an oral statement, and is not barred by Section 9(E).

21. Fulton has previously modified this same Loan without any SBA signature or recital of SBA approval. On February 25, 2024, Fulton executed an Allonge to SBA Note (the "Allonge"), attached as Exhibit 7 to Fulton's Complaint (ECF No. 1-7) that reduced the Loan's principal balance from $4,340,000 to $4,215,000 and re-amortized the monthly payments. The Allonge was signed only by Fulton, through Senior Vice President Deborah Goldberg, and by the Borrowers and Guarantors; the SBA was not a signatory, and the Allonge does not recite that SBA approval was obtained or required. The Allonge also expressly provides that notices under the Loan Documents "may be sent by electronic delivery … and such notices shall be deemed given when sent." *Id*. at Section 8.

**The 2025 Default, Acceleration, and Cure**

22. In 2025, Vision fell behind on its loan payment obligations, and made no regular monthly payments on the Loan between June 2025 and the December 19, 2025 cure payment described below.

23. As a result of Vision falling behind on its loan payment obligations, Fulton caused a Notice of Acceleration to be issued on or about September 17, 2025 (the "September Acceleration"). The September Acceleration is already before this Court as Exhibit 9 to Fulton's Complaint (ECF No. 1-9), and is not re-attached here.

24. On October 7, 2025, Fulton caused an Appointment of Substitute Trustee to be recorded in the Prince William County land records with respect to the Deeds of Trust, placing a cloud on title to the Centreville Property. A copy of the Appointment of Substitute Trustee is attached hereto as Exhibit J.

25. In December 2025, Counterclaim Plaintiffs began negotiations with Fulton to cure the default and reinstate the Loan.

26. On December 3, 2025, Brown contacted Fulton and advised he was prepared to remit the full past-due balance, and asked Fulton to waive the late charges.

**The December 15, 2025 Reinstatement Agreement**

27. On December 15, 2025, Fulton responded to Counterclaim Plaintiffs, by and through Michael Nord, Esquire.

28. At all times relevant hereto, Michael Nord, Esq. was an attorney for, and authorized agent of, Fulton.

29. When Michael Nord responded to Counterclaim Plaintiffs on December 15, 2025, he had the authority to respond on behalf of Fulton.

30. The response provided by Michael Nord on December 15, 2025 was specifically authorized by Fulton.

31. On December 15, 2025, Michael Nord sent a response to Counterclaim Plaintiffs via email, in which he made a specific offer related to the Loan. That email stated, in relevant part: *"Provided that on or before Friday, December 19, 2025 you: (1) wire transfer the amount of $275,333.00 to Fulton Bank … which amount includes the past due principal, interest and late charges as well as the payment for December, 2025 AND; (2) deliver an active Certificate of Hazard Insurance naming Fulton Bank as loss payee …, Fulton Bank will waive the default*

*pertaining to the past due payments and re-instate the Loan."* A copy of the December 15, 2025 email is attached hereto as Exhibit B. The December 15, 2025 email and the agreement it embodies are referred to herein as the "Reinstatement Agreement."

32. Fulton's December 15, 2025 offer specified two conditions, a date certain for performance, and a single, unambiguous consequence of performance: waiver of the default pertaining to the past-due payments and reinstatement of the Loan.

33. On December 19, 2025—before the deadline Fulton set—the Borrowers wired $275,333 to the account Fulton designated, with the reference "FBO Vision Property Holdings LLC, Account #9001," under Fed Reference No. 20251219E6B74K1C000625, and delivered to Fulton an active Certificate of Hazard Insurance naming Fulton Bank as loss payee.

34. Fulton received the $275,333 wire on December 19, 2025, accepted it, and has retained those funds at all times since.

35. The Borrowers accepted Fulton's offer by full and timely performance. The Reinstatement Agreement is supported by consideration, including the Borrowers' immediate lump-sum payment of the entire past-due arrearage, delivery of the required insurance certificate, and the parties' compromise of the accelerated status of the Loan.

36. The Reinstatement Agreement is in a writing drafted by Fulton's authorized counsel and transmitted electronically on Fulton's behalf.

37. As set forth above, the Loan Documents themselves already treat electronic delivery as effective notice under the Loan. The December 15, 2025 email also satisfies any requirement that the Reinstatement Agreement be in a signed writing. *See* Va. Code § 59.1-479, *et seq*. (Uniform Electronic Transactions Act).

**Fulton Immediately Breaches the Reinstatement Agreement**

38. However, instead of applying the payment to the past-due principal, interest and late charges and the December 2025 payment, as the Reinstatement Agreement required—which Fulton explicitly admits was the purpose of the payment in Paragraph 24 of its Verified Complaint—Fulton applied the payment entirely to the principal balance.

39. Further, instead of waiving the default pertaining to the past-due payments and reinstating the Loan, Fulton kept the Loan in default/liquidation status within its Special Assets group and left the September Acceleration in place.

40. These actions are reflected on the commercial loan statement dated November 19, 2025 through December 21, 2025 sent by Fulton to Counterclaim Plaintiffs. A copy of the commercial loan statement dated November 19, 2025 through December 21, 2025 is attached hereto as Exhibit C. That statement reflects a "Last Payment Date" of December 19, 2025 and a reduction of the principal balance by the exact amount of the wire.

41. Counterclaim Plaintiffs questioned this re-characterization, and attempted to get Fulton to correct the statement, so as to accurately depict the Loan's current status.

42. Fulton failed and refused to do so.

43. Fulton's actions thus breached the Reinstatement Agreement.

44. The Borrowers were unable to obtain accurate information from Fulton regarding the Loan balance, payments, or amounts due. The information Fulton kept repeating to them was inaccurate as described above.

45. Moreover, because Fulton kept the Loan accelerated and in liquidation status, no regular monthly installment was due—or could have been accepted as such—on January 1, 2026 or February 1, 2026. The Borrowers could not default on monthly installments that Fulton's own accelerated posture barred them from making.

46. The Borrowers stood ready, willing, and able to resume regular monthly payments upon reinstatement, and repeatedly sought corrected figures and accurate statements from Fulton for that purpose. Fulton refused to provide them.

47. Fulton then continued to report a past-due balance on monthly statements, and accrued additional late charges, including a $1,960.76 late charge on the very next monthly bill, assessed January 12, 2026 against the very default it had agreed to waive, and further $1,960.76 late charges assessed on February 11, March 11, and April 13, 2026. The January statement further reported hundreds of thousands of dollars in past-due balances, and Fulton's April 2026 statement asserted an erroneous past-due balance of $392,145.99. A copy of the January, 2026 statement is attached hereto as Exhibit D. A copy of the April 2026 statement is attached hereto as Exhibit F.

48. Despite the fact that Fulton still refused to correct the Loan, or to comply with the December 15, 2025 Reinstatement Agreement, Fulton sent Counterclaim Plaintiffs a second Notice of Acceleration on February 11, 2026, demanding payment of $4,225,633.74 (the "February Acceleration"). A copy of the February 11, 2026 Notice of Acceleration is attached hereto as Exhibit E.

49. The February 11, 2026 Notice of Acceleration was premised on the same alleged late payments and interest as had been settled and waived in the December 15, 2025 Reinstatement Agreement. The $4,225,633.74 demand includes $41,975.70 in late charges accrued against the pre-December 19 default—the same past-due amounts the December 15, 2025 email identified and the December 19, 2025 wire satisfied. A waived and cured default cannot be the basis of an acceleration.

50. In the alternative, on Fulton's own stated position that the Loan was never reinstated and remained accelerated and in liquidation status at all times after September 17, 2025, no regular monthly installments were due on January 1, 2026 or February 1, 2026, and the February Acceleration—premised on the failure to make those very installments—is invalid for that independent reason.

51. Counterclaim Plaintiffs remited $160,000 in further payments through April 2026, despite Fulton still not correcting the statements or properly applying the Borrowers' payments.

**Counterclaim Plaintiffs' Demands and Fulton's Refusal**

52. On March 11, 2026, and again through counsel on April 7, 2026, the Borrowers formally demanded that Fulton honor the Reinstatement Agreement, correct its ledger and statements, and rescind the accelerations. Fulton refused.

53. By letter dated April 3, 2026, Fulton's Vice President, Virginia Akin, took the position that because the Loan is an SBA-guaranteed loan in liquidation status, it could not be removed from liquidation status and returned to regular servicing without a written workout or modification agreement approved by the SBA.

54. In April 2026, Fulton proposed a draft Modification Agreement that conditioned restoration of the Loan on the Borrowers' release of their claims arising from Fulton's breach of the Reinstatement Agreement. The Borrowers declined to purchase, by release, the performance they had already paid for.

55. Fulton's SOP-compliance obligations run to the SBA, not to the Borrowers. The Reinstatement Agreement is itself a written agreement providing for the resumption of regular payments of the kind contemplated by SOP 50 57. If Fulton believed a further SBA-approved writing was required before it could reinstate the Loan, Fulton—an SBA lender uniquely

positioned to know the SOPs' requirements—knew or should have known that on December 15, 2025, before it induced and accepted the Borrowers' $275,333 payment. Counterclaim Plaintiffs do not assert a freestanding claim for violation of the SOPs; rather, Fulton's actual or constructive knowledge of the SOPs' requirements is alleged as evidence bearing on Fulton's bad faith and the reasonableness of the Borrowers' reliance on the Reinstatement Agreement.

**How Fulton's Breach Harmed Counterclaim Plaintiffs**

56. As a result of Fulton applying the payment entirely to the principal balance, Fulton issued Counterclaim Plaintiffs a 2025 IRS Form 1098 that omits approximately $250,000 in interest that the Reinstatement Agreement allocated from the December 19, 2025 wire and that should have been credited and reported as interest paid. A copy of the 2025 Form 1098 is attached hereto as Exhibit H.

57. The Vision entities are pass-through taxpayers. The understatement of interest paid has deprived Counterclaim Plaintiffs of the corresponding 2025 deductions, causing an estimated $126,875 in immediate tax harm, comprising lost deduction value at blended pass-through rates, projected federal and state underpayment penalties, and the administrative cost of amending returns once Fulton corrects its ledger.

58. Fulton continues to issue monthly mortgage statements that inaccurately reflect that the Loan is in default, has been accelerated, has been referred to outside counsel, and is in liquidation status. They further inaccurately reflect that the Loan has past-due late fees and interest.

59. Each of the statements referenced above is in direct contravention of the December 15, 2025 Reinstatement Agreement.

60. Vision operates its business through access to financing.

61. Specifically, Vision operates a car dealership. When customers seek Vision's assistance in obtaining financing, Vision funds retail loan originations through commercial credit facilities extended by its lenders, subject to caps those lenders set.

62. The primary commercial lender, with the most favorable rates for Vision, was Pinnacle Financial Group ("PFG"). PFG extended the Borrowers two facilities: an operating line of credit used to fund retail loan originations, and a separate $600,000 floor-plan line of credit used to acquire inventory.

63. PFG's credit facilities are underwritten and their limits fixed annually; the operating line of credit was subject to its annual renewal on April 15, 2026, for the 2026-2027 operating year.

64. When its financing was up for renewal in April 2026, Vision was contractually required to share with PFG its financial documents, including loan statements from Fulton.

65. As a direct result of Fulton's inaccurate and false statements in the monthly loan statements as described above, PFG denied Vision's pending request to increase its operating line of credit to $6,000,000 for the 2026-2027 operating year. Instead, by formal Notice of Default dated April 20, 2026, PFG reduced Vision's operating line of credit by $750,000—to a $4.5 million ceiling at which Vision's active portfolio balance already sat, effectively locking Vision out of any new originations. Furthermore, PFG severely restricted Vision's $600,000 floor-plan line of credit prohibiting any new inventory acquisition. A copy of PFG's April 20, 2026 Notice is attached hereto as Exhibit G, and a July 17, 2026 email communication further confirming the denial of the $6,000,000 increase and the specific floor-plan restrictions is attached hereto as Exhibit I.

66. PFG's April 20, 2026 Notice states in writing that the credit reduction was taken "primarily due to concerns regarding the status of the first-priority mortgage held by Fulton Bank"; that "the continued existence of this default materially impacts Pinnacle's credit exposure"; and that "the Fulton Bank loan continues to appear as past due," the continued existence of which "constitutes a default under PFG's loan agreement."

67. Because PFG's facility limits were fixed at the April 15, 2026 annual renewal, the reduction and freeze are locked in for the entirety of the 2026–2027 operating year and cannot be undone by an after-the-fact correction of Fulton's ledger.

68. Fulton knew or reasonably should have foreseen that its monthly loan statements would be provided to and relied upon by the Borrowers' other lenders, and that false statements of default, acceleration, referral to counsel, and liquidation would inflict precisely this kind of credit harm. The Borrowers' March 11 and April 7, 2026 demands expressly warned Fulton of the harm its refusal to correct was causing.

69. The PFG credit reduction and floor-plan freeze have catastrophically impaired Vision's ability to acquire inventory, fund consumer loans, and operate its dealership in the ordinary course, causing lost sales, lost retail loan originations, margin compression, and increased cost of capital in amounts to be established at trial.

70. Fulton has threatened to foreclose on the Deeds of Trust and security agreements. The October 7, 2025 Appointment of Substitute Trustee remains of record, clouding title to the Centreville Property, which is essential to Counterclaim Plaintiffs' ongoing operations.

71. The February Acceleration and Fulton's collection posture further expose Brown and Gomez, as guarantors, to demands for amounts they do not owe, including late charges and default interest accrued against a default Fulton agreed to waive and the Borrowers cured.

**Count I – Breach of Contract (The Reinstatement Agreement)**

72. The allegations of the preceding paragraphs are re-alleged and incorporated herein by reference.

73. Fulton breached the Reinstatement Agreement by, among other things: failing to apply the December 19, 2025 payment to past-due principal, interest, and late charges and the December 2025 payment as agreed; failing to waive the default; failing to reinstate the Loan and return it to regular servicing; assessing late charges and default interest against the waived default; issuing false and inaccurate statements of account; and accelerating the Loan on February 11, 2026 on the basis of the waived and cured default.

74. Every contract in Virginia includes an implied covenant of good faith and fair dealing in its performance. Fulton's conduct described above also violated that covenant, which Counterclaim Plaintiffs assert as part of this breach-of-contract claim.

75. As a direct, natural, and foreseeable consequence of Fulton's breach, Counterclaim Plaintiffs have suffered damages including: the misapplication of the $275,333 cure payment and approximately $160,000 in subsequent payments; improper late charges and default interest; $126,875 in tax harm; the PFG credit reduction and floor-plan freeze and the resulting lost profits, lost originations, margin compression, and increased cost of capital; and the costs of responding to an acceleration that should never have issued.

76. In addition, as a result of the breach, Counterclaim Plaintiffs have incurred substantial business damage in an amount to be determined.

77. Counterclaim Plaintiffs have no adequate remedy at law for the equitable relief requested below, as Fulton's continuing failure to correct its ledger, statements, and collection

posture causes ongoing harm to Counterclaim Plaintiffs' credit and operations that cannot be fully redressed by an award of money damages alone.

**WHEREFORE,** Counterclaim Plaintiffs respectfully request that judgment be entered against Counterclaim Defendant Fulton Bank, N.A. in amounts to be established at trial; specific performance of the Reinstatement Agreement, including an order requiring Fulton to apply the December 19, 2025 payment and all subsequent payments as agreed, waive the default, reinstate the Loan to regular servicing, rescind the September and February Accelerations, correct its ledger and monthly statements, issue a corrected 2025 IRS Form 1098, and revoke the Appointment of Substitute Trustee; prejudgment interest from December 19, 2025 and post-judgment interest at the judgment rate until paid; all costs; and such other and further relief as this Court deems appropriate.

**Count II – In the Alternative, Unjust Enrichment (Money Had and Received)**

78. The allegations of the preceding paragraphs are re-alleged and incorporated herein by reference.

79. In the alternative, if the Reinstatement Agreement is held unenforceable, the Borrowers conferred a benefit on Fulton by wiring $275,333 on December 19, 2025 and by making approximately $160,000 in subsequent monthly payments, in each case in the reasonable expectation—induced by Fulton—that Fulton would waive the default, reinstate the Loan, and return it to regular servicing. Fulton solicited, accepted, and retained those payments with full knowledge of the circumstances under which they were made and of the Borrowers' expectation.

80. Fulton has retained the benefit of those payments without performing the reinstatement for which they were made—instead misapplying the funds, continuing to assess late charges and default interest against the default the payments were made to cure, and

accelerating the Loan a second time. Fulton's retention of the payments under these circumstances is inequitable, and equity and good conscience require restitution. As a result, Counterclaim Plaintiffs have been damaged in an amount not less than $435,333, plus interest.

**WHEREFORE,** Counterclaim Plaintiffs respectfully request that judgment be entered against Counterclaim Defendant in the amount of $435,333 as restitution of the payments unjustly retained; prejudgment interest from December 19, 2025 and post-judgment interest at the judgment rate until paid; all costs; and such other and further relief as this Court deems appropriate.

**Count III – In the Alternative, Fraud in the Inducement**

81. The allegations of the preceding paragraphs are re-alleged and incorporated herein by reference.

82. Fulton has taken the position—through Ms. Akin's April 3, 2026 letter and through its counsel—that the Loan could not lawfully be removed from liquidation status and reinstated without a written workout or modification agreement approved by the SBA.

83. If that position is correct, then on December 15, 2025 Fulton represented that it would waive the default and reinstate the Loan upon the Borrowers' payment while knowing that it did not intend to perform, and believed it could not perform, that promise. A promise made with a present intention not to perform is a false representation of existing fact. The specific misrepresentation at issue is the promise identified in Paragraph 31 above, made by Fulton's authorized agent, Michael Nord, on December 15, 2025.

84. Fulton, an SBA lender uniquely positioned to know the SOPs' requirements, made the representation knowingly or with reckless disregard for its truth, and with the intent to induce the Borrowers to pay $275,333.

85. The Borrowers reasonably relied on Fulton's representation and, in reliance, wired $275,333 and delivered the required insurance certificate on December 19, 2025.

86. As a direct and proximate result, Counterclaim Plaintiffs have been damaged in an amount not less than $275,333, plus consequential damages as set forth above. Counterclaim Plaintiffs have no adequate remedy at law for the full consequences of Fulton's fraud, including Fulton's retention of the fraudulently induced payments and the threatened foreclosure on the Belle Isle Property and the Centreville Property, unique real properties essential to Counterclaim Plaintiffs' operations.

87. Fulton's conduct was willful and wanton and evinced a conscious disregard of Counterclaim Plaintiffs' rights, entitling Counterclaim Plaintiffs to punitive damages.

**WHEREFORE,** Counterclaim Plaintiffs respectfully request that judgment be entered against Counterclaim Defendant in the amount of $275,333, together with consequential damages; punitive damages in the amount of $350,000, the maximum permitted by Va. Code § 8.01-38.1; prejudgment interest from December 19, 2025 and post-judgment interest at the judgment rate until paid; equitable rescission of Fulton's misapplication of the December 19, 2025 payment and restitution of the $435,333 in payments fraudulently induced, with a constructive trust impressed upon those funds; temporary, preliminary, and permanent injunctive relief under Fed. R. Civ. P. 65 barring any foreclosure or trustee's sale under the Deeds of Trust predicated on the default that the fraudulently induced payments were made to cure; an order estopping Fulton from enforcing that default; an award of Counterclaim Plaintiffs' attorneys' fees in connection with the fraud and the equitable relief sought in this action, as permitted by *Prospect Development Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291 (1999), and *St. John v.*

*Thompson*, 299 Va. 431, 854 S.E.2d 648 (2021); all costs; and such other and further relief as this Court deems appropriate.

**Count IV – Declaratory Judgment and Injunctive Relief (28 U.S.C. §§ 2201–2202)**

88. The allegations of the preceding paragraphs are re-alleged and incorporated herein by reference.

89. An actual, justiciable controversy exists between Counterclaim Plaintiffs and Fulton concerning the validity and effect of the Reinstatement Agreement, the September and February Accelerations, the charges and statements described above, and Fulton's right to foreclose under the Deeds of Trust.

90. Fulton has breached the Reinstatement Agreement as set forth above.

91. Fulton's February 11, 2026 Notice of Acceleration of the Loan is invalid as it incorporates late fees and penalties that had been specifically waived and paid under the Reinstatement Agreement and, in the alternative, because no regular monthly installments were due while Fulton kept the Loan accelerated and in liquidation status.

92. Fulton is estopped and barred from breaching the Reinstatement Agreement on the one hand and seeking to enforce a purported breach of the Loan by Counterclaim Plaintiffs—especially where the purported breach by Counterclaim Plaintiffs has been created as a result of Fulton's own breach of the Reinstatement Agreement.

93. The Court should enter a declaratory judgment that the September 17, 2025 Notice of Acceleration was satisfied and waived by the December 19, 2025 cure; that the February 11, 2026 Notice of Acceleration is void and invalid; that no late charges or default interest accrued after December 19, 2025 on the waived default; that the Appointment of Substitute Trustee is of no force and effect and must be revoked of record; that the Loan is

reinstated; that Brown and Gomez, as guarantors, are not personally liable under the Brown Guaranty or the Gomez Guaranty for any late charges, default interest, or other amounts improperly assessed against the waived and cured default; and such further declarations as are required to fulfill the terms of the December 15, 2025 Reinstatement Agreement.

94. Counterclaim Plaintiffs cannot be afforded full relief from Fulton's breach without specific performance, as the harm from the breach is continuing and will continue to exist even after a judgment in this matter if Fulton is not compelled to comply. Foreclosure on the Belle Isle Property and the Centreville Property—unique real properties essential to Counterclaim Plaintiffs' operations—would cause imminent and irreparable harm.

95. There is no adequate and complete remedy at law.

96. Fulton should be required to specifically perform and reinstate the Loan, waive the default, apply the cure payment to interest, late fees, and principal as set forth in the Reinstatement Agreement, correct its monthly statements and ledgers so as to accurately reflect that the Loan is not in liquidation and is current, and take such other actions as are required to fully and completely comply with the Reinstatement Agreement, including rescission of both Notices of Acceleration, issuance of a corrected 2025 IRS Form 1098, and revocation of the Appointment of Substitute Trustee.

**WHEREFORE,** Counterclaim Plaintiffs respectfully request that this Court enter a declaratory judgment as set forth above; enter temporary, preliminary, and permanent injunctive relief under Fed. R. Civ. P. 65 barring any foreclosure or trustee's sale under the Deeds of Trust pending resolution of this action; enter an injunction ordering and requiring Fulton to specifically perform as set forth above; declare that Brown and Gomez are not personally liable under the Brown Guaranty or the Gomez Guaranty for the amounts described above; award Counterclaim

Plaintiffs their attorneys' fees in connection with the fraud and the equitable relief sought in this action, as permitted by *Prospect Development Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291 (1999), and *St. John v. Thompson*, 299 Va. 431, 854 S.E.2d 648 (2021); award Counterclaim Plaintiffs all costs; and grant such other and further relief as this Court deems appropriate.

**Jury Demand**

Counterclaim Plaintiffs demand a jury trial on all claims, counterclaims, and issues so triable under Fed. R. Civ. P. 38(b).

VISION PROPERTY HOLDINGS LLC
VISION MOTORS, INC.
VISION SERVICE CENTER, INC.
GREEN LIGHT CONSULTING CORP.
JASON J. BROWN
NUVIA H. GOMEZ.
By Counsel

/s/Thomas R. Breeden
Thomas R. Breeden, Esquire, VSB # 33410
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109
(703) 361-9277, facsimile (703) 337-0441
email TRB@TBreedenlaw.com
Counsel for Defendants / Counter Plaintiffs

/s/Brian L. Bromberg
Brian L. Bromberg, Esquire (*pro hac vice* application to be filed)
Bromberg Law Office, P.C.
99 Main Street
Nyack, New York 10960
Tel: (212) 248-7906
Fax: (212) 248-7908
Email: brian@bromberglawoffice.com
Counsel for Defendants / Counter Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on the 24th day of August, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/Thomas R. Breeden
Thomas R. Breeden